**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO.  3:14-CV-595-CHL**

TANGER S. SWALLOWS,                                                                    **Plaintiff,**

**v.**

 **COMMISSIONER OF SOCIAL SECURITY,**                                    **Defendant.**

### MEMORANDUM OPINION AND ORDER

Before the Court is the complaint (DN 1) of plaintiff Tanger S. Swallows ("Swallows") filed August 27, 2014.  In her complaint, Swallows seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") pursuant to 42 U.S.C. § 405(g) (2012) ("Any individual, after any final decision of the Commissioner of Social Security . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . .").  Swallows filed a Motion for Summary Judgment (DN 12) and accompanying memorandum (DN 12-2) and a Fact and Law Summary (DN 12-3) on January 29, 2015.  The Commissioner filed a Fact and Law Summary on April 1, 2015 (DN 15). Swallows filed a "response" (DN 18) to the Commissioner's Fact and Law Summary on April 15, 2015.

The parties have consented to the jurisdiction of a magistrate judge to enter judgment in this case with direct review by the Sixth Circuit Court of Appeals in the event an appeal is filed (DN 5).  Therefore, this matter is ripe for review.  For the reasons set forth below, the final decision of the Commissioner is affirmed.

## I.    BACKGROUND

Swallows filed an application for disability and disability insurance benefits on or about June 11, 2011.  (R. 127-29.)  Swallows alleged that she became disabled on March 31, 2010 as a result of obstructive sleep apnea and bilateral leg edema.  (R. 124, 127, 140.)  Administrative Law Judge William C. Zuber (the "ALJ") conducted a hearing on March 28, 2013.  (*Id*. at 33.) Swallows was present and represented by counsel Brent Yonts.  (*Id*. at 19, 34-35.)  Sharon B. Lane, a vocational expert, also testified at the hearing.  (*Id*.)  In a decision dated May 10, 2013, the ALJ engaged in the five-step evaluation process promulgated by the Commissioner to determine whether an individual is disabled, and in doing so, made the following findings.

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.  The claimant has not engaged in substantial gainful activity since March 31, 2010, the alleged onset date.

3.  The claimant has the following severe impairments:  obesity, bilateral degenerative joint disease of the knees, cervical degenerative disc disease, fibromyalgia, tarsal tunnel syndrome, obstructive sleep apnea, and depression.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except:  unskilled, routine work with an option to sit or stand every 30-45 minutes; no more than occasional climbing of ramps/stairs, stooping, and crouching; no crawling, kneeling, or climbing ladders/ropes/scaffolds; no exposure to dangerous machinery or unprotected heights; no more than occasional contact with coworkers/supervisors and no contact with the general public; any changes in the work routine or environment would be rare and gradually introduced; and can sustain concentration, persistence, and pace for periods of 2 hours at a time.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on July 9, 1967 and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 31, 2010, through the date of this decision.

(R. 19-27.)

Swallows timely requested an appeal to the Appeals Council on or about May 20, 2013, seeking review of the ALJ's decision. (*Id*. at 14-15.) The Appeals Council denied Swallows's request for review on July 3, 2014. (*Id*. at 1-4.) At that point, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 422.210(a); *see also* 42 U.S.C. § 405(h) (discussing finality of the Commissioner's decision). Swallows filed this action on August 27, 2014. (DN 1.)

## II. DISCUSSION

The Social Security Act authorizes payment of disability insurance benefits to persons with disabilities. Social Security Act, Disability Insurance Benefits, 42 U.S.C. §§ 401-34 (2012). To establish entitlement to disability insurance benefits, a claimant must establish that she became "disabled" prior to the expiration of her insured status. 42 U.S.C. § 423(a), (c); *Moon v.*

*Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). Therefore, Swallows must show that the conditions she complained of rendered her disabled on or before December 31, 2016, the date that her insured status expired. An individual shall be considered "disabled" if "[s]he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a).

### A.    Standard of Review

In conducting its review, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Sec'y of Health and Human Servs.*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson,* 471 F.2d 1265 (6th Cir. 1972)). Rather, the Court's review is limited to determining whether the findings set forth in the final decision of the Commissioner are supported by "substantial evidence" and that the correct legal standards were applied. 42 U.S.C. § 405(g); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013); *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011). If the answer is "yes," then the Court may not even inquire as to whether the record could support a decision the other way. *Smith v. Sec'y of Health and Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989).

"Substantial evidence exists when a reasonable mind could accept the evidence as adequate to support the challenged conclusion, even if that evidence could support a decision the other way." *Cotton v. Sec'y of Health and Human Servs.*, 2 F.3d 692, 695 (6th Cir. 1993) (quoting *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993)) (internal quotation marks omitted). Therefore, "[a] reviewing court will affirm the Commissioner's decision if it is based on

substantial evidence, even if substantial evidence would also have supported the opposite conclusion." *Gayheart*, 710 F.3d at 374.

## B.     Five-Step Sequential Evaluation Process

The Commissioner has promulgated regulations that set forth a five-step sequential evaluation process that an ALJ must follow in evaluating a disability claim. 20 C.F.R. §§ 404.1520, 416.920. In summary, the evaluation proceeds as follows:

1)     Is the claimant engaged in substantial gainful activity? If the answer is "yes," the claimant is not disabled. If the answer is "no," proceed to the next step.

2)     Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement and significantly limits his or her ability to perform basic work activities? If the answer is "no," the claimant is not disabled. If the answer is "yes," proceed to the next step.

3)     Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within Appendix 1 to Subpart P of Part 404 of this chapter? If the answer is "yes," the claimant is disabled. If the answer is "no," proceed to the next step.

4)     Does the claimant have the RFC to return to his or her past relevant work? If the answer is "yes," then the claimant is not disabled. If the answer is "no," proceed to the next step.

5)     Even if the claimant cannot perform past relevant work, does the claimant's RFC, age, education, and past work experience allow him or her to perform a significant number of jobs in the national economy? If the answer is "yes," the claimant is not disabled. If the answer is "no," the claimant is disabled.

*Id.*

The claimant bears the burden of proof with respect to the first four steps. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422-23 (6th Cir. 2008). The burden shifts to the Commissioner at the fifth step to prove that there are available jobs in the national economy that the claimant is capable of performing. *Id*. at 423. The claimant, however, always retains the burden of proving lack of RFC. *Herr v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999).

## C.      Swallows's Contentions

Swallows appears to contest five of the ALJ's findings: Finding 3, Finding 4, Finding 5, Finding 10, and Finding 11. (DN 12-3, p. 2.) Swallows's supporting memoranda contain no headings or any other indication of what argument pertains to what challenged finding. As a result, the Court is left to surmise. The Court will attempt to address all of Swallow's arguments with respect to each contested finding.

### 1.      Finding 3

At step two of the five-step sequential evaluation process, the ALJ made Finding 3. In Finding 3, the ALJ found that Swallows had the following severe impairments: obesity, bilateral degenerative joint disease of the knees, cervical degenerative disc disease, fibromyalgia, tarsal tunnel syndrome, obstructive sleep apnea, and depression. The Court is unsure what Swallows's contention is with respect to Finding 3. It does not appear that she is claiming that a particular impairment should have been deemed severe. Rather, most of Swallows's argument focuses on the alleged failure of the ALJ to consider the mental and physical limitations resulting from her impairments, including the weight he gave to the various medical source opinions in the record; the Court will address those arguments when addressing the other disputed findings below. Thus, the Court finds that Swallows has not provided any meaningful argument (or any argument

at all) as to why Finding 3 was not supported by substantial evidence. *See United States v. Layne*, 192 F.3d 556, 567 (6th Cir. 1999) (finding that issues adverted to in a "perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 996-96 (6th Cir. 1997)) (internal quotation marks omitted). Therefore, the Court declines to consider a remand on the basis of Finding 3.

## 2. Finding 4

In Finding 4, the ALJ determined that Swallows does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Swallows only contests Finding 4 insofar as it relates to the severity of her mental impairments. In particular, Swallows alleges that her mental impairments meet the criteria for Listing 12.04 or 12.06.

### a. Criteria for Listing 12.04 and 12.06

The claimant has the burden of proving that she has an impairment that meets or medically equals a listing in Appendix 1. *See* 20 C.F.R. § 404.1520(4)(iii), (d). "When a claimant can show that an impairment is listed in Appendix 1 ("the listings"), or is equal to a listed impairment, the ALJ must find the claimant disabled without consideration of the claimant's age, education and work experience." *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987). To *meet* a listing in Appendix 1, the claimant must have a medically determinable impairment that satisfies all of the criteria in the listing. 20 C.F.R. § 1525(d). "When we determine if your impairment *medically equals* a listing, we consider all evidence in your case record about your impairment(s) and its effects on you that is relevant to this finding" along with any opinion given by "one or more medical or psychological consultants

designated by the Commissioner." 20 C.F.R. § 1526(c) (emphasis added). Listing 12.04 – Affective Disorders – covers depression; Listing 12.06 – Anxiety Related Disorders – covers anxiety. 20 C.F.R. Part 404, Subpart P, Appendix 1.

Listing 12.04 is met when the criteria in both Paragraph A and Paragraph B are satisfied, *or* when the criteria in Paragraph C are satisfied. 20 C.F.R Part 404, Subpart P, Appendix 1, Listing 12.04 (A)-(C). In other words, the claimant's mental impairment must meet the criteria in Paragraph A (medically documented persistence of certain symptoms) that result in, as described in Paragraph B, at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. For purposes of assessing a mental impairment, "marked" means more than moderate but less than extreme. 20 C.F.R. § 404, Subpart P, Appendix 1, 12.00 – Mental Disorders (2014). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere *seriously* with your ability to function independently, appropriately, effectively, and on a sustained basis." *Id*. (emphasis added).

With respect to Paragraph C in Listing 12.04, the criteria are met when the claimant has a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or

change in the environment would be predicted to cause the individual to decompensate; or (3) current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.06 is met when the criteria in both Paragraph A and Paragraph B are satisfied, *or* when the criteria in both Paragraph A and Paragraph C are satisfied. 20 C.F.R Part 404, Subpart P, Appendix 1, Listing 12.06 (A)-(C). With respect to the former, the claimant's mental impairment must meet the Paragraph A criteria (medically documented persistence of certain symptoms) that result in, as described in Paragraph B, at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. With respect to the latter, the claimant's mental impairment must meet the Paragraph A criteria which, as described in Paragraph C, result in a complete inability of the claimant to function independently outside the area of the home. *Id*.

### b. ALJ's Findings and Swallows's Arguments

First, the ALJ determined that Swallows did not meet the Paragraph B criteria for Listing 12.04 or 12.06. Specifically, the ALJ determined that Swallows had only moderate restrictions in the activities of daily living, social functioning, and in maintaining concentration, persistence or pace; the ALJ reasoned that this was because Swallows had received very little and only conservative treatment to corroborate her allegations, and the objective clinical evidence was largely normal or not otherwise consistent with greater than moderate severity, as discussed in greater detail with respect to Finding 5. (R. 22.) The ALJ also determined that Swallows had no

in-patient psychiatric hospitalizations or similarly severe symptomatology to support an episode of decompensation. (*Id*.) Therefore, the ALJ concluded that the criteria in Paragraph B were not met because Swallows's mental impairments did not result in at least two marked limitations or one marked limitation and repeated episodes of decompensation.

Second, the ALJ considered whether the Paragraph C criteria were satisfied. With respect to Listing 12.04, the ALJ determined that the evidence failed to establish repeated episodes of decompensation, propensity toward decompensation, or the need for a highly supportive living arrangement. (R. 22-23.) With respect to Listing 12.06, the ALJ found that the record evidence failed to show the complete inability of Swallows to function independently outside the area of her home. (*Id*.) Finally, the ALJ noted that he relied on his RFC assessment in Finding 5 to determine the degree of limitation he utilized in the Paragraph B mental function analysis that he conducted in Finding 4. (*Id*. at 23.) Consequently, to determine whether the ALJ's finding that her mental impairments did not equal Listing 12.04 or 12.06 was supported by substantial evidence, the Court will consider whether the ALJ's mental RFC finding was supported by substantial evidence.

Swallows's argument regarding whether the severity of her mental impairments meets Listing 12.04 and/or 12.06 is sparse and appears to be based on the opinions given and tests administered by Dr. Robert L. Smith, Ph.D. Dr. Smith performed a psychological consultative examination on Swallows upon request of her counsel. (R. 51). Swallows's main contention appears to be that the ALJ could not appropriately consider the mental limitations assessed by Dr. Smith absent the presence of a "medical advisor" at the administrative hearing. (DN 12-2, p. 4.) Swallows also appears to contest the weight given to the mental limitations assessed by Dr.

Smith; that is, Swallows appears to argue that, had the ALJ given Dr. Smith's opinions full weight, the ALJ would have found that Swallows met Listing 12.04 and/or 12.06. (*Id*. at 5.) The Court will address each contention below.

### i. No medical advisor present

"[W]hile the ALJ must base his findings of fact and legal conclusions on medical information that has been provided . . . solicitation of an expert medical opinion is discretionary." *Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555, 562 (6th Cir. Aug. 7, 2014). Furthermore, 20 C.F.R. § 1527 provides discretion, rather than a mandate, to the ALJ to decide whether to solicit medical expert testimony. *Simpson v. Comm'r of Soc. Sec*., 344 F. App'x 181, 189 (6th Cir. Aug. 27, 2009); *see also* 20 C.F.R. § 1527(e)(2)(iii) ("Administrative law judges *may* also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart.") (emphasis added). Dr. Smith's report provides ample information from which the ALJ could assess the severity of Swallows's mental impairments. Dr. Smith not only gave his opinion regarding the severity of her mental impairments, but included the results of several tests that he administered to her. (R. 348-53.) Dr. Smith also completed a "Medical Source Statement of Ability To Do Work-Related Activities (Mental)" which the ALJ used in determining whether the criteria of Listing 12.04 or 12.06 were met as well as in assessing Swallows's RFC. Most importantly, the ALJ had the discretion whether to solicit expert medical testimony regarding Swallows's mental impairments and chose not to do so.

The only case that Swallows cites in support of this argument is *Frank v. Comm'r of Soc. Sec.*, 455 F. Supp. 2d 554, 558 n.3 (E.D. Tex. 2006), which states that a medical advisor is required only when establishing the onset date of disability for slowly progressive impairments or when determining whether a claimant's impairments are equivalent in severity to impairments in the listings. Swallows provides no substantive argument that her mental impairments are *equal to* an impairment in the listings (as opposed to *meeting* a listing, specifically Listing 12.04 or 12.06), only a conclusory assertion. Instead, her arguments focus on whether her mental impairments met Listing 12.04 and/or 12.06. As the Court has stated, issues alluded to in a perfunctory manner, unaccompanied by some effort at developed argument, are deemed waived. *Layne*, 192 F.3d at 567. Consequently, her contention that a medical advisor was required at the administrative hearing falls flat.[1]

### ii.        Weight given to opinions of Dr. Smith

Swallows takes issue with the little weight given to the opinions of Dr. Smith by the ALJ with regard to her mental limitations, especially in light of the results of some of the tests administered by Dr. Smith. Swallows, in large part, rehashes Dr. Smith's opinions in her brief; nonetheless, the Court concludes that any residual arguments lack merit. As the Court has stated, although the ALJ considered Dr. Smith's opinions in conjunction with Finding 5 – determination

---

[1] The Court notes that the opinions by Dr. Smith were rendered on March 27, 2012 – after the State agency consultative examination was performed by Dr. Peter Urda, D.O. on August 20, 2011; Dr. Urda's opinions did not assess any mental impairments, only physical impairments. Indeed, it is not clear that Swallows alleged any mental impairments at the time of Dr. Urda's examination. However, Swallows does not argue – nor does the Court find – that these circumstances *required* the ALJ to obtain an expert opinion regarding whether Swallows's mental impairments met a listing, as this would presumably not have changed Dr. Urda's opinions regarding her physical impairments. *Cf.* Social Security Ruling 96-6P, 1996 WL 374180, at *4 (S.S.A. July 2, 1996) (stating that an ALJ must obtain an updated medical opinion from a medical expert when "additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council *may change* the State agency medical or psychological consultant's finding that the impairment(s) is *not equivalent* in severity to any impairment in the Listing of Impairments") (emphasis added). Moreover, as the Court discusses in the next section, Dr. Smith's opinions were not entitled controlling weight.

of Swallows's RFC – that analysis is relevant to Finding 4; the ALJ relied on his analysis in Finding 5 in determining, in Finding 4, that Swallows's mental impairments did not meet a listing. Therefore, the Court will discuss whether the ALJ's decision to give Dr. Smith's opinions little weight was supported by substantial evidence.

### a. RFC finding

The RFC finding is the ALJ's ultimate determination of what a claimant can still do in a work setting despite his or her physical and mental limitations. 20 C.F.R. §§ 404.1545(a), 404.1546. The RFC finding is based on a consideration of medical source statements and all other evidence, medical and non-medical, in the record. 20 C.F.R. §§ 404.1529, 404.1545(a), 416.946. "Medical source statements are medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." Social Security Ruling ("SSR") 96-5p, 1996 WL 374183, at *4 (S.S.A. July 2, 1996) "Acceptable medical sources" include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). Thus, in making the RFC finding, the ALJ must (1) assign weight to the medical source statements in the record; and also (2) consider the descriptions and observations of the claimant's limitations as a result of the impairments from the claimant and the claimant's family and friends. 20 C.F.R. § 404.1545(a)(3).

The source of a medical opinion dictates the process by which the ALJ gives it weight. *Gayheart*, 710 F.3d at 376. Treating sources must be given controlling weight if the opinion is

(1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) "not inconsistent with the other substantial evidence in [the] case record." *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted). If the treating source is not given controlling weight, then the "opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Id.* (citing 20 C.F.R. § 404.1527(c)(2)-(6)). Whatever weight the ALJ accords a treating source's opinion, he or she must set forth "good reasons" for doing so. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) ("The regulation requires the agency to 'give good reasons' for not giving weight to a treating physician in the context of a disability determination.") (citing 20 C.F.R. § 404.1527(d)(2)). Opinions from examining and non-examining medical sources are assessed under these same guidelines (*i.e.*, examining relationship, specialization, consistency, and supportability), but are never assessed for controlling weight. *Id.* Finally, while opinions from treating, examining, and non-examining medical sources must be considered in determining RFC, the ALJ is ultimately responsible for the RFC finding. 20 C.F.R. § 404.1527(e); SSR 96-5p, 1996 WL 374183, at *2.

### b. Analysis

Although Swallows mentions in passing that Dr. Smith was a treating source, there is no evidence that Swallows was seen by Dr. Smith more than one time or for any purpose other than to perform a mental evaluation in conjunction with her disability claim. Swallows has pointed to no authority that mandates a medical source be considered a treating source after only one visit for the purpose of supporting a disability claim. Indeed, the case law suggests that a single

14

examination does not render Dr. Smith a treating source. *See, e.g.*, *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir. Feb. 9, 2006) ("Kornecky cites no authority where a federal court has found a source to be a treating source after only one visit. However, a plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship."). Consequently, Dr. Smith's opinions were not entitled to controlling weight, and the ALJ was not required to articulate good reasons for the weight given to them. *Gayheart*, 710 F.3d at 376; *Strang v. Comm'r of Soc. Sec.*, 611 F. App'x 271, 275 (6th Cir. May 4, 2015) ("The magistrate judge pointed out that a physical therapist 'is not considered either a 'treating source' or an 'acceptable medical source,'" so that, under controlling regulations, the ALJ did not have to provide 'good reasons' for declining to give weight to the therapist's opinion.") (internal citation omitted). The ALJ nonetheless considered the opinions of Dr. Smith, but ultimately gave them little weight. (R. 25-26.) The Court finds that there is substantial evidence to support the ALJ's decision.

First, the ALJ found that Swallows's mental health treatment history "generally show[ed] statements for treatment that d[id] not come close to reflecting the physical and mental limits alleged." (R. 25.) The ALJ noted that Swallows testified that she no longer visits with others and leaves the room when others are around, and that the Global Assessment of Functioning ("GAF") score and a medical opinion (from Dr. Smith) supported marked symptomology and essentially disabling mental impairment. (*Id.* at 25.) However, the ALJ found that counseling notes from Jim Walker, L.C.S.W. showed that Swallows was actually getting out and seeking activities and work within a short period of beginning treatment despite her purportedly extreme physical and mental allegations. (*Id.*) The ALJ also found that, apart from Swallow's subjective

report of symptoms, the overall clinical observations reported as part of Dr. Smith's evaluation were largely normal and inconsistent with her allegations of memory loss, social withdrawal, and very limited attention/focus due to sleep difficulty or from any other cause. (*Id*.)

The Court agrees. As Swallows's notes, she received a score of 48 on the Beck Depression Inventory test administered by Dr. Smith, which placed her in the severe range of depression. (R. 351); she also notes that her GAF score, identified as 40, was classified as severe (*id*. at 353). A GAF score between 41 and 50 indicates serious symptoms (*e.g*., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g*., no friends, unable to keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000) ("DSM-IV").[2] But, as the ALJ recognized, these scores were not consistent with the overall normal clinical observations made by Dr. Smith during his evaluation conducted on March 27, 2012. Dr. Smith noted that Swallows gets up between 7:00 a.m. and 9:30 a.m., makes her bed, and usually starts a load of wash. (R. at 349.) Swallows reported that she uses her computer a lot and does light housework, although her husband and daughter do most of heavy housework and cooking. (*Id*.) Swallows also reported watching television, cooking some, and talking on

---

[2] In an unpublished opinion, the Sixth Circuit Court of Appeals found that, according the DSM's explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning, and that it was not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place. *Kornecky v. Comm'r of Soc. Sec*., 167 F. App'x 496, 511 (6th Cir. Feb. 9, 2006). Nor has Swallows produced any authority. Moreover, the "latest edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) no longer includes the GAF scale. It was recommended that the GAF be dropped from the DSM–5 for several reasons, including its conceptual lack of clarity [and] questionable psychometrics in routine practice." *Davis v. Comm'r of Soc. Sec. Admin.*, No. 1:13CV01556, 2014 WL 4182737, at *8 (N.D. Ohio Aug. 21, 2014) (internal citations and quotation marks omitted). "Moreover, a GAF score reflect[s] an individual's functioning at a particular moment in time; one score [i]s generally not helpful in determining whether Plaintiff's alleged impairment lasted at least 12 months, as is required to be considered disabled." (*Id*.)

the phone to friends. (*Id*.)  Dr. Smith observed that Swallows was cooperative during the examination, oriented to time, place, and person, and that her speech was logical, coherent, and goal directed.  (*Id*. at 349.)  Swallows's effort was perceived as good, and she exhibited a good range of affect.  (*Id*. at 350.)  Her memory for remote and recent events was intact.  (*Id*.)  Dr. Smith administered the Weschler Adult Intelligence Scale III ("WAIS III") and Wide Range Achievement Test 4 ("WRAT 4"), which measure intelligence quotient ("IQ") and reading/math computation, respectively, and those results did not indicate severe mental impairment. Swallows's WAIS III score was in the dull normal range, and Dr. Smith noted that her life history suggested that her IQ scores may be an underestimate of her intellectual abilities.  (*Id*.) The WRAT 4 tests indicated a sixth grade word reasoning level and eighth grade math computation level.[3]

As the ALJ also noted, Walker's counseling notes were inconsistent with Swallows's subjective allegations and Dr. Smith's opinion of disabling mental impairment.  Walker's notes span from February 15, 2012 to February 19, 2013.  On September 12, 2012, Walker's notes indicated that Swallows was seeking part-time work   (R. 432.)  On October 2, 2012, Walker's notes indicated that Swallows was feeling "markedly better" and was continuing to seek out activities and work. (*Id*. at 431.)  Walker also stated that Swallows's prognosis was "good" and that the initial treatment goals were to "develop coping skills for managing mood disruptions." (*Id*. at 438.)   Finally, Swallows's mental health treatment was conservative, consisting of

---

[3] The Court notes that, while Swallows recites the results of certain tests administered by Dr. Smith, *e.g*., Beck Anxiety Scale, WAIS III, WRAT 4, and the Minnesota Multiphasic Personality Inventory 2 ("MMPI-2"), she does not state why the results of these particular tests compel the conclusion that her mental impairments were severe enough to meet a listing.  For example, although Swallows states that she scored a 22 on the Beck Anxiety Scale, this score actually "places her in the *moderate* [not marked] range of anxiety."  (DN 351 [emphasis added].) Swallows does not allege that the WAIS III and WRAT 4 tests indicate severe mental impairment either.

counseling sessions with Walker and medication (*id.* at 429-38), which indicates the absence of a disabling mental condition. *See Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 678 (6th Cir. Oct. 2, 2013) (stating that a "conservative treatment approach suggests the absence of a disabling condition"); *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 808 (6th Cir. May 15, 2012) (finding that ALJ properly rejected opinion of treating physician because claimant had received conservative treatment for her allegedly disabling mental impairment). In sum, there is substantial evidence to support the ALJ's determination that the assessed mental limitations by Dr. Smith and the allegations of memory loss, social withdrawal, and very limited attention/focus by Swallows were inconsistent with, and not supported by, Dr. Smith's own observations and the treatment notes of Walker. Even medical opinions of treating physicians are "only accorded great weight when they are supported by sufficient clinical findings and are consistent with the evidence." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994).

As a result, there is also substantial evidence to support the ALJ's conclusion that the severity of Swallows's mental impairments did not meet the criteria for Listing 12.04 or Listing 12.06. That is, Dr. Smith's observations, Walker's treatment notes, and overall conservative treatment are consistent with moderate restriction in the activities of daily living, social functioning, and in maintaining concentration/persistence/pace that were assessed by the ALJ. Moreover, Swallows does not dispute that she had no in-patient psychiatric hospitalizations or similarly severe symptomatology to support an episode of decompensation. Therefore, the ALJ's conclusion that Swallow's mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, *i.e.*, that the criteria in Paragraph B were not met, is supported by substantial evidence. Furthermore, the

record evidence does not support, with respect to Paragraph C, Listing 12.04, repeated episodes of decompensation, propensity toward decompensation, or the need for a highly supportive living arrangement. (R. 22-23.) Nor, with respect to Paragraph C, Listing 12.06, does the record evidence support the complete inability of Swallows to function independently outside the area of the home. (*Id*.) Importantly, the ALJ did not completely ignore Swallows's mental impairments; he crafted the RFC in Finding 5 to take into account the moderate mental limitations assessed. (*See* R. 23 [mandating that Swallows have no more than occasional contact with coworkers/supervisors and no contact with the general public; that any changes in the work routine or environment would be rare and gradually introduced; and that Swallows could sustain concentration, persistence, and pace for periods of two hours at a time].) Therefore, the Court finds that Swallows's arguments with respect to Finding 4 lack merit.

### 3.     Finding 5

Swallows generally argues that, in formulating the RFC, the ALJ improperly gave little or no weight to the opinions of Dr. Lynn Womack, Jim Hawkins, and Dr. Smith; Swallows further argues that the ALJ failed to explain the weight assigned to same.

The ALJ determined that Swallows had the RFC to perform sedentary work with these limitations: unskilled, routine work with an option to sit or stand every 30-45 minutes; no more than occasional climbing of ramps/stairs, stooping, and crouching; no crawling, kneeling, or climbing ladders/ropes/scaffolds; no exposure to dangerous machinery or unprotected heights; no more than occasional contact with coworkers/supervisors and no contact with the general public; any changes in the work routine or environment would be rare and gradually introduced; and can sustain concentration, persistence, and pace for periods of 2 hours at a time.

### a.    Dr. Womack

The ALJ gave the opinions of Dr. Womack – a family practitioner and treating physician – little weight.  (R. 26.)  The ALJ stated that the opinions for Dr. Womack allow for essentially less than sedentary work for less than 8-hours a day, and are inconsistent with the consultative examination evidence and other clinical findings of record.  (*Id.*)

Dr. Womack completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" ("Medical Source Statement") on February 7, 2012.  (R. 315-18.)  In that Medical Source Statement, Dr. Womack opined that Swallows had the following limitations:[4] can occasionally lift/carry less than 10 pounds; can stand less than 2 hours in an 8-hour workday; can sit less than 6 hours in a 8-hour workday; that she was limited in pushing/pulling in both the upper and lower extremities; could only occasionally climb ramps/stairs/ladders/ropes/scaffolds, balance, kneel, crouch, crawl, or stoop; and was occasionally limited in reaching in all directions (including overhead) and handling (gross manipulation).  (*Id.*)  In the Medical Source Statement, Dr. Womack indicated that these limitations were supported by the following medical findings: neuropathy in the upper and lower extremities; pain and weakness in bilateral upper and lower extremities; and pain and weakness of upper extremities.  (*Id.*)

As the Court has noted, an opinion from a treating source must be given controlling weight when it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2).  Stated another way, if a treating source's medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the record, it is not entitled to controlling weight.  *See* SSR 96-2p,

---

[4] The Court will not recite the areas where Dr. Womack opined that Swallows had no limitations.

1996 WL 374188, at *2 (S.S.A. July 2, 1996). Whatever weight the ALJ accords a treating source's opinion, it must set forth "good reasons" for doing so. *Id*. at *5; *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004).

There is substantial evidence to support the ALJ's conclusion that the extreme limitations assessed by Dr. Womack are inconsistent with the consultative examination performed by Dr. Peter Urda, D.O. and the record medical evidence. And, contrary to Swallows's assertion, the ALJ did explain why he gave Dr. Womack's opinions little weight. A review of the opinions of Dr. Urda and the record medical evidence is instructive.[5]

Swallows's alleged onset date was March 31, 2010. Over a year later, on August 20, 2011, Dr. Urda performed a consultative examination of Swallows. (R. 211-13.) Dr. Urda found that Swallows's grip strength and lower/upper extremity strength was 5/5; station and gait were normal; and that she was able to stand, squat, and tandem walk. (*Id*. at 212.) While Dr. Urda noted 1+ edema in the lower extremities, he also noted that Swallows does not use a cane, walker, wheelchair, or other assistive device for ambulation. (*Id*.) Moreover, Dr. Urda found that Swallows had full range of motion of the right upper extremity, left upper extremity, the cervical spine, knees, feet, and ankles. (*Id*. at 212-13.) Dr. Urda concluded that Swallows was capable of handling objects, standing, sitting, and walking, but limited in her ability to constantly bend and twist at the waist while carrying, pushing, pulling, or lifting heavy weights; therefore, he found that she could perform sedentary types of work. (*Id*. at 213.)

With respect to the record medical evidence, Swallows began complaining of swelling in her extremities as early as April 2009. (*Id*. at 223.) On November 28, 2011, Swallows was referred to and evaluated by a vascular specialist, Dr. Glenn Lambert, and Brandy Stinson,

---

[5] The Court notes that Swallows does not appear to contest the ALJ's summary of the record medical evidence.

Advanced Practice Registered Nurse ("APRN"), at Norton Vascular Associates for the swelling. (*Id*. at 305.)    The recommendation at that time was to continue wearing compression stockings, ambulate frequently, and exercise as much as possible.  (*Id*. at 306.)   Swallows followed up with Dr. Lambert on December 19, 2011, where he opined that Swallows did not have any significant vascular disease or venous insufficiency and suggested that she be evaluated for fibromyalgia; Dr. Lambert recommended that Swallows continue wearing compression hose for the swelling. (*Id*. at 304.)  On March 15, 2012, Swallows was seen by Dr. Cameron Luo and was diagnosed with fibromyalgia; she was prescribed Cymbalta at that time.  (*Id*. at 403-06.)  At that visit, Dr. Luo observed that her neurological examination, including motor and sensory examination, was largely intact.  (*Id*. at 405.)  On November 15, 2012, Swallows had a follow-up visit with Dr. Luo which showed that her condition was largely unchanged and no further recommendations were recommended.  (*Id*. at 413-14.)  She was also instructed to continue medication with an increase in the Cymbalta dosage.  (*Id*. at 414.)   On February 15, 2013, Dr. Luo saw Swallows again, noting that her condition had remained unchanged except for tendonitis in her right elbow and arthritis in her right knee.  (*Id*. at 426.)

Swallows also has a history of cervical disease, but the treatment has been conservative. On August 24, 2011, an MRI showed mild disc bulging at C5-C6 and C6-C7 of the cervical spine, but with no evidence of high-grade canal stenosis.  (*Id*. at 247-48, 403.)   Other than possibly medication, the records do not appear to reflect any other treatment for this condition.

On June 28, 2012, Swallows visited Commonwealth Foot and Ankle Center where she was seen by Jasen Pederson, Doctor of Podiatric Medicine ("DPM"), who diagnosed her with tarsal tunnel syndrome and plantar fasciitis; recommendations for her foot conditions as well as

the edema included proper footwear, elevation of the extremities, avoidance of salt, use of elastic compression, stretching exercises, avoiding walking barefoot, Epsom salt soaks, "PRICE" therapy, rest, and ice. (*Id*. at 385-86.) Dr. Pederson noted +5/5 muscle strength for all four lower extremity groups bilaterally. (*Id*. at 385.) Dr. Pederson saw Swallows again on July 13, 2013, again noting +5/5 muscle strength, with no changes in recommendations.

In December 2012, Dr. Robert Goodin diagnosed Swallows with right knee patellofemoral arthritis, and she was prescribed Mobic and four weeks of physical therapy. (*Id*. at 415-16.) Dr. Goodin saw Swallows again on March 11, 2013 and prescribed her Prednisone and was going to have her return for Orthovisc injections. (*Id*. at 444.) However, Dr. Goodin noted that, while Swallows was tender along the medial joint line bilaterally as well as the parapatellar retinaculum, she had full extension; he also noted no instability due to varus/valgus stress testing and 4+/5 strength. (*Id*.)

In sum, as the ALJ found, the treatment for Swallows's pain has remained relatively moderate in nature, consisting of medication and a course of physical therapy; as recited above, the record medical evidence supports this conclusion. *See Branon*, 539 F. App'x at 678 (stating that a "conservative treatment approach suggests the absence of a disabling condition"). This course of treatment is not consistent with Dr. Womack's opinion in the Medical Source Statement that Swallows is essentially unable to perform *any* work. Nor were Dr. Womack's opinions supported by any specific objective medical record evidence; rather, Dr. Womack generally alleged that her findings were based on neuropathy and pain/weakness in the upper and lower extremities. *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 274 (6th Cir. 2010) ("This disability opinion is not explained in any way, is not tied to any physical examination

findings or empirical testing results, and is not justified by reference to findings made by other physicians . . . Dr. Erulkar appears [sic] not have conducted any testing or prepared any report or letter explaining any objective medical bases for her opinion. As a consequence, the supplemental evidence furnished by Dr. Erulkar amounted, in material part, to no more than a statement of her opinion, based on Ferguson's own self-reporting, that Ferguson was disabled— i.e., an opinion that relates to an issue 'reserved to the Commissioner;' an opinion that is 'never entitled to controlling weight or special significance.'"). Swallows, who has the burden of proof at this step, does not point to any objective medical evidence to support Dr. Womack's conclusions either. Furthermore, Dr. Womack's findings regarding work restrictions were inconsistent with the medical records recited above and the consultative examination by Dr. Urda, including the general lack of any findings (other than those of Hawkins) that Swallows was physically limited in the manner suggested by Dr. Womack. Notably, the ALJ did not *completely* ignore Dr. Womack's restrictions either. The RFC finding included a sit/stand option every 30-45 minutes and that Swallows could no more than occasionally climb ramps/stairs, stoop, or crouch, and that she could never crawl, kneel, or climb ladders/ropes/scaffolds. (*Cf.* R. 23 [RFC finding] *with* R. 315-18 [Medical Source Statement].)

The Court realizes that fibromyalgia is an unusual impairment in that its symptoms are often not supported by objective medical evidence. *See Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 243 (6th Cir. 2007) ("On at least one occasion, we have recognized that fibromyalgia can be a severe impairment and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs."); *Cooper v. Astrue*, No. 1:10CV-00012-J, 2010 WL 5557448, at *8 (W.D. Ky. Oct. 15, 2010), report and

recommendation adopted, No. 1:10CV12-J, 2011 WL 53195 (W.D. Ky. Jan. 7, 2011) (discussing case law illustrating the treatment of fibromyalgia in Social Security cases, but noting that it does read *Rogers* as requiring a particularly detailed and explicit documentation of the regulatory factors). "Nonetheless, a *diagnosis* of fibromyalgia does not automatically entitle [Swallows] to disability benefits . . . ." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. Jan. 15, 2008). Nor did the ALJ completely ignore Swallows's physical impairments resulting from fibromyalgia either; rather, he concluded that the symptoms alleged did not cause a *disabling* degree of severity and were instead most consistent with the RFC alleged. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (There is no serious doubt that Sarchet is afflicted with the disease but it is difficult to determine the severity of her condition because of the unavailability of objective clinical tests. Some people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of Rheumatology)," 310 *British Med.J.* 386 (1995); *Preston v. Secretary of Health & Human Services,* 854 F.2d 815, 818 (6th Cir.1988) (per curiam), but most do not and the question is whether Sarchet is one of the minority."). Thus, for the reasons stated, the Court finds that the ALJ gave good reasons for giving the opinions of Dr. Womack little weight.

### b.    Hawkins

Swallows makes similar arguments with respect to Hawkins, a physical therapist, who examined her on February 10, 2012. That is, Swallows argues that the ALJ improperly gave Hawkins's report little weight in spite of the fact that it was based on an objective test and had a

validity score of 78%. Swallows does not appear to allege that Hawkins was a treating medical source.

Hawkins assessed restrictions that allowed for less than sedentary work for less than 8 hours a day. For example, Hawkins found that Swallows was only able to tolerate sitting for 30 to 45 minutes a day before leg swelling occurred; could tolerate standing 20 to 30 minutes; could tolerate walking for 20 to 30 minutes; could bend occasionally without difficulty; could reach occasionally; could squat occasionally in the 50-75% range; could not kneel or crawl, and could climb occasionally with a rail. (R. 320.) Hawkins also found that Swallows could not lift any weight using her torso. (*Id*.) The ALJ gave Hawkins's opinions little weight for the same reasons that he gave Dr. Womack's opinions little weight – the consultative examination performed by Dr. Urda and other clinical findings of record were not consistent with the severity assessed by Hawkins. The Court finds that the ALJ's decision to do so was supported by substantial evidence.

First, Hawkins is a physical therapist and is therefore not an "acceptable medical source." *See Doyle v. Comm'r of Soc. Sec.*, No. 13-12916, 2014 WL 4064251, at *18 (E.D. Mich. Aug. 18, 2014) (stating that a physical therapist is not an "acceptable medical source" let alone a treating source). According, to 20 C.F.R. § 404.1513(a), an "acceptable medical source" includes licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). Therefore, Hawkins's opinions were not entitled to controlling weight, and the ALJ was not required to articulate good reasons for the weight given to them. *Gayheart*, 710 F.3d at 376; *Strang*, 611 F. App'x at 275 ("The magistrate judge pointed out that a physical therapist 'is not considered either

a 'treating source' or an 'acceptable medical source,'" so that, under controlling regulations, the ALJ did not have to provide 'good reasons' for declining to give weight to the therapist's opinion.") (internal quotation marks omitted). Instead, Hawkins is covered under 20 C.F.R. § 404.1513(d) as an "other source." *See* SSR 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Nonetheless, evidence from "other sources" *may* be used to show the severity of the claimant's impairment(s) and how they affect the claimant's ability to work. 20 C.F.R. § 404.1513(d) ("In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources . . . ."). In SSR 06-03p, the Social Security Administration ("SSA") clarified and ostensibly expanded the weight to be assigned to "other sources," including medical sources that are not "acceptable medical sources" and "non-medical sources." The SSA first described the factors considered in weighing medical opinions from "acceptable medical sources" such as treating sources, examining sources, and non-examining sources as listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d).[6] SSR 06-03P, 2006 WL 2329939, at * 3 (citing 20 C.F.R. 404.1527(d) and 416.927(d)). The SSA then stated that, "[a]lthough the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors *can* be applied to opinion evidence from 'other sources.'" SSR 06-03P, 2006 WL 2329939, at * 4 (emphasis added). These factors include: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4)

---

[6] The numbering of the treating physician rules in the Code of Federal Regulations changed on March 26, 2012. Section 416.927(d)(2) became 416.927(c)(2), and Section 404.1527(d)(2) became 404.1527(c)(2). *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014).

how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion. *Id*. at *4-*5.

Here, there is no evidence that Hawkins saw Swallows other than on February 10, 2012. And while Hawkins is a physical therapist, his opinions were based on this apparent one-time visit. Most importantly, as the Court noted in its analysis with respect to Dr. Womack, the ALJ found that the treatment for Swallows's pain has remained relatively moderate in nature, consisting of medication and a course of physical therapy; as recounted by the Court, the record medical evidence supports this conclusion. *See Branon*, 539 F. App'x at 678 (stating that a "conservative treatment approach suggests the absence of a disabling condition"). This course of treatment is not consistent with the severe limitations assessed by Hawkins in which he essentially concludes that Swallows is unable to perform any work. Additionally, Hawkins's findings were inconsistent with the consultative examination by Dr. Urda, who also physically examined Swallows. Notably, the RFC finding by the ALJ was not totally devoid of limitations expressed by Hawkins. For example, the RFC included an option to sit or stand every 30 to 45 minutes, no more than occasional climbing of ramps/stairs, and no crawling or kneeling. Therefore, the Court finds that the ALJ's decision to give the opinions of Hawkins little weight was supported by substantial evidence. *See Stanley v. Comm'r of Soc. Sec.*, No. 1:14-CV-870, 2015 WL 9473402, at *5 (S.D. Ohio Dec. 2, 2015), *report and recommendation adopted*, No. 1:14CV870, 2015 WL 9460322 (S.D. Ohio Dec. 28, 2015) ("While regulations require an ALJ to articulate 'good reasons' on the record only when rejecting the opinion of a treating *physician,* in this case, the ALJ went far beyond than what the regulations require by articulating 'good

reasons' for rejecting the physical therapist's opinions."); *Walters v. Comm'r of Soc. Sec.*, No. 11-15171, 2013 WL 1364719, at *11 (E.D. Mich. Mar. 12, 2013), *report and recommendation adopted*, No. 11-CV-15171, 2013 WL 1364712 (E.D. Mich. Mar. 29, 2013) (finding, although the ALJ's explanation was not as exhaustive as the claimant might desire, there was substantial evidence to support ALJ's decision to give little weight to opinions of other sources because those opinions were inconsistent with the medical record).

### c. Dr. Smith

Swallows's arguments regarding Dr. Smith with respect to Finding 4 and Finding 5 are essentially the same – the ALJ improperly gave little weight to the opinions of Dr. Smith despite the fact that Dr. Smith relied on objective testing to support his opinions. In discussing the ALJ's determination that Swallows did not meet Listing 12.04 or 12.06, the Court discussed the opinions of Dr. Smith, an examining source, finding that there was substantial evidence to support the ALJ's decision to give them little weight. That is, the Court found that there was substantial evidence to support the ALJ's determination that the assessed mental limitations by Dr. Smith and the allegations of memory loss, social withdrawal, and very limited attention/focus by Swallows were inconsistent with, and not supported by, Dr. Smith's own observations and the treatment notes of Walker; the Court further found that Dr. Smith's observations, Walker's treatment notes, and overall conservative treatment were consistent with moderate restriction in the activities of daily living, social functioning, and in maintaining concentration, persistence or pace assessed by the ALJ. The Court will not repeat the entire analysis again here.[7]

---

[7] Swallows also throws in the argument mix a conclusory allegation that the ALJ "did not consider her obesity as a factor of limitation in his findings of what she can and cannot do." (DN 18, p. 4.) First, the ALJ did, in fact, consider the effect of Swallow's obesity when determining whether she had a medically determinable impairment that was severe and whether that impairment met a listing and in determining the RFC. (R. 22 [listing effect of

As a final matter, the Court notes that *Hendricks v. Comm'r of Soc. Sec.*, Civ. Action No. 4:07-cv-13-EHJ, 2008 WL 2783277 (N.D. Ohio June 6, 2011) – one of the two cases cited by Swallows in her brief – does not provide her any relief. The ALJ in *Hendricks*, with the exception of one restriction, discounted the exertional and non-exertional limitations expressed by the treating, examining, and non-examining physicians. *Id.* at *5. As a result, the District Court found that "it is reasonable to conclude there is no medical opinion in the record that supports the ALJ's findings regarding plaintiff's credibility and residual functional capacity. As a lay person the ALJ simply is not qualified to interpret the raw medical data in functional terms." *Id.* Therefore, the District Court found that the ALJ's findings regarding plaintiff's credibility and RFC were not supported by substantial evidence in the record.

The ALJ, not a medical expert, is responsible for the ultimate determination of a plaintiff's RFC. "The ALJ must evaluate a number of factors in determining a plaintiff's RFC, including the medical evidence and the plaintiff's testimony, and this evaluation is not limited to medical opinion evidence." *Raber v. Comm'r of Soc. Sec.*, No. 4:12 CV 97, 2013 WL 1284312, at *16 (N.D. Ohio Mar. 27, 2013). Moreover, the "Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence." *Henderson v. Comm'r of Soc. Sec.*, No.

---

obesity on existing impairments and stating that these considerations had been taken into account in the sequential evaluation process even though no treating or examining medical source had specifically attributed additional or cumulative limitations to Swallows's obesity].) Second, Swallows has not developed any argument as to what the ALJ should have done differently. *See Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir. Jan 31, 2006) ("[Social Security Ruling 02-01p] only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations. It is a mischaracterization to suggest that Social Security Ruling 02–01p offers any particular procedural mode of analysis for obese disability claimants."]); *Dickson v. Comm'r of Soc. Sec.*, No. CIV.A. 11-10281, 2011 WL 7070657, at *7 (E.D. Mich. Nov. 1, 2011), *report and recommendation adopted*, No. 11-10281, 2012 WL 175329 (E.D. Mich. Jan. 23, 2012) (stating that no set procedure for analyzing obesity is requiring by the SSR 02-01p). Consequently, Swallows's arguments regarding this issue have no merit.

1:08 CV 2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010). In this case, although the ALJ gave little weight to the opinions of Dr. Womack, Dr. Smith, and Hawkins, he did not ignore their opinions completely; nor did he totally disregard Swallow's subjective complaints either. Rather, he factored in some limitations in the RFC, finding Swallows could perform a limited range of sedentary work. Moreover, the ALJ specifically relied on the opinions of Dr. Urda. *See Colaner v. Comm'r of Soc. Sec.*, No. 12-CV-00716, 2013 WL 5487037, at *4 (S.D. Ohio Sept. 30, 2013) ("[A]n ALJ has sufficiently developed the record, and may avoid a . . . remand, when the ALJ acts based on *some* medical expert opinion evidence."). The ALJ also considered the objective medical evidence. As a result, Swallow's reliance on *Hendricks* is misplaced.

### d.      Subjective allegations

It is unclear whether Swallows is actually arguing that the ALJ improperly ignored her subjective allegations in formulating the RFC, or whether she is simply arguing that the medical source opinions should have been given more weight because they are consistent with her subjective complaints. Nonetheless, for the sake of completeness, the Court will briefly address the ALJ's finding that, while Swallows's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, her statements considering the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (*See* R. 24.)

When making a RFC finding, in addition to assigning weight to the medical source statements in the record, the ALJ will consider the descriptions and observations of the claimant's limitations as a result of his or her physical and mental impairments from the claimant and the claimant's family and friends. 20 C.F.R. § 404.1545(a)(3). The ALJ clearly considered Swallows's descriptions of her symptoms and limitations in his opinion. (R. 23-24.) The Court

will not repeat the entirety of that description here; in summary, the ALJ recounted the history of Swallows's description of her symptoms, beginning with her initial allegation of disability due to sleep apnea and bilateral leg edema. (*Id*. at 23.) The ALJ noted that, at that time, Swallows indicated that she vacuumed, dusted, mopped, and washed clothes, but only slowly and with many breaks; that she fixed meals for herself and her family; had little to no problem with most personal care/hygiene; and that she drove a car, shopped a couple of times per week, played board games, and spent time with others several times per week. (*Id*. at 24.) The ALJ also noted that Swallows alleged difficulty with lifting, postural activities, standing, walking, and sitting, and that she could only pay attention for 5 minutes at a time and had to re-read written instructions. (*Id*.) The ALJ noted that in an updated report Swallows alleged pain in her lower legs and upper arms as well as balance problems; the ALJ also noted that Swallows testified at the administrative hearing that the problems she had described earlier persisted. (*Id*.) The ALJ also recounted Swallows's testimony at the hearing that indicated that she was even more limited than previously described in personal care/hygiene, housework, lifting, standing, and walking, as well as in social interactions. (*Id*.)

While the ALJ must consider all of a claimant's statements about her symptoms, including pain, a claimant's statement that she is experiencing pain or other symptoms will not, taken alone, establish that she is disabled; there must be medical signs and laboratory findings that show the existence of a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged. 20 C.F.R. §§ 404.1529(a). Thus, in assessing a claimant's RFC, the Commissioner must necessarily consider the subjective allegations of the claimant and make credibility findings. *See id*.; SSR 96-7p, 1996 WL 374186, at *2-*3 (S.S.A. July 2, 1996).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Accordingly, the ALJ concluded that while the medically determinable impairments could reasonably be expected to cause the alleged symptoms, Swallows's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the RFC. The ALJ then discussed step-by-step why, in light of the other record evidence, Swallows's statements were not credible to the extent that they were inconsistent with the RFC.

First, the ALJ noted that the consultative examination performed by Dr. Urda, approximately 5 months after the date of alleged onset, was largely normal and not otherwise consistent with Swallows's allegations or her previous statements regarding her disability. For example, Dr. Urda found that she had 5/5 strength in her lower extremities; station and gait were normal; she did not use any kind of cane or assistive device; and was able to stand and squat and tandem walk. Dr. Urda also found no evidence of impairment in her upper extremities, no neurological deficits, and full range of motion in the cervical spine, knees, and feet/ankles, but limited range of motion of the lumbar spine and hips and inconsistent straight leg raising between sitting and supine. In sum, Dr. Urda did not corroborate Swallows's allegations of disabling limitations and allowed for a limited range of sedentary work.

Second, the ALJ discussed the overall conservative treatment for Swallows's impairments (discussed *supra*) and the clinical findings with respect to the cervical disease and tarsal tunnel, which were consistent with mild to moderate abnormalities and sedentary limits.

The ALJ also noted that Swallows was not diagnosed with fibromyalgia until March 2012, after the exclusion of other causes. Third, the ALJ explained why Swallows's mental health treatment history generally showed statements for treatment that did not come close to reflecting the physical and mental limits alleged (also discussed *supra* in more detail). Fourth, the ALJ included reasons why he gave little weight to the opinions of Dr. Smith, Dr. Womack, and Hawkins. (*See* R. at 25-26.) Finally, the ALJ observed that nothing in the medical record precluded sitting and that Swallows had never described sitting as a problem for her legs anywhere in the treatment record in spite of her complaints at the hearing, and that her overall pain treatment had been relatively moderate in nature and not consistent with the levels of pain and constant nature of symptoms alleged by her.[8]

The Court is limited to evaluating whether or not the ALJ's explanations for partially discrediting Swallows's allegations were reasonable and supported by substantial evidence in the record. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Moreover, "[d]iscounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walter*, 127 F.3d at 531. As the Court has recounted, there was substantial evidence to support the ALJ's decision not to

---

[8] For the first time on reply, Swallows argues that the RFC does not include an accommodation for the "medical necessity of elevating her feet with some regularity during the day." (DN 18, p. 3.) Although Swallows coins this accommodation a "medical necessity," she cites to no such requirement by any medical provider. And, the Court has only found two references in the medical records that reference elevation of legs. The first is a November 28, 2011 note from Swallows's evaluation by Norton Vascular Associates, which reported that Swallows "states the swelling had some improvement with elevation." (R. 305.) The second is a note regarding the edema from Dr. Pedersen – a doctor in podiatric medicine who diagnosed Swallows with tarsal tunnel syndrome – that states "I recommend elevation of the extremity as much as possible." (*Id.* at 385.) At the administrative hearing, Swallows did testify that she propped up her feet or put a pillow behind her legs to get the swelling to decrease; however, in response to the ALJ's question whether any of her medical providers ever came "up with any kind of treatment that managed to get that [swelling] under control," Swallows responded, "No." (*Id.* at 44.) Consequently, Swallows has not met her burden to show that elevating her feet is a "medical necessity"; rather, it appears to be simply part of the description by Swallows's of her symptoms and limitations, which the ALJ deemed partially credible.

give full weight to Swallows's own description of her symptoms and limitations. Thus, the Court must affirm this decision, even if there is substantial evidence in the record that would have supported the opposition conclusion. *Jones*, 336 F.3d at 475. Consequently, there is no reason to remand on this basis.

### 4. Finding 10

In Finding 10, the ALJ determined that, considering Swallows's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she can perform. The thrust of Swallows's argument with respect to Finding 10 is that (1) the ALJ posed a hypothetical to the vocational expert that was not supported by evidence in the record; and (2) the ALJ rejected the vocational expert's testimony regarding other hypotheticals posed to her.

With respect to (1), a "vocational expert's testimony concerning the availability of suitable work may constitute substantial evidence where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments." *Smith v. Comm'r of Soc. Sec.*, 307 F.3d 377, 378 (6th Cir. 2001). The ALJ posed a hypothetical to the vocational expert with all of the limitations in the record that he found credible. In particular, the ALJ asked the vocational expert to consider the following hypothetical: "[A]ssume a hypothetical individual of the same age, education, and work history as the claimant. This individual would be capable of unskilled, routine, sedentary work with an option to sit or stand every 30 to 45 minutes; no more than occasional climbing of ramps and stairs; occasional stopping and crouching; no crawling, kneeling, climbing ladders, ropes or scaffolds. This individual would be additionally limited to no exposure to dangerous machinery or

unprotected heights; no more than occasional contact with coworkers and supervisors; no contact with the general public; any changes in the work routine or environment would be rare and gradually introduced; and this individual could sustain concentration, persistence and pace foe periods of two hours at a time." (R. 68-69.) The vocational expert testified that Swallows could not return to past relevant work, but that there would be other jobs available based on the restricted range of sedentary work described in the hypothetical. (*Id*. at 69.)

Because this hypothetical accurately set forth the limitations in the RFC propounded by the ALJ – which the Court has already found is supported by substantial evidence – the ALJ did not err in relying on the vocational expert's testimony. Consequently, the ALJ's determination that there were jobs existing in the national economy which Swallows could perform was supported by substantial evidence. *See, e.g.*, *Dyer v. Soc. Sec. Admin.*, 568 F. App'x 422, 428-29 (6th Cir. June 11, 2014) ("[T]he hypothetical posed to the vocational expert properly took into account the well-supported findings by the administrative law judge concerning Dyer's functional limitations. A vocational expert's testimony in response to an accurate hypothetical represents substantial evidence that the claimant has the vocational qualifications to perform specific jobs."); *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. Feb. 9, 2007) (finding that, when based on a hypothetical encompassing the claimant's limitations, a vocational expert's testimony constitutes substantial evidence to support determination that claimant can perform past relevant work).

With respect to (2), Swallows is essentially rehashing her argument that the ALJ erred in assigning little weight to the opinions of Dr. Womack, Dr. Smith, and Hawkins. That is, Swallows argues that the ALJ erred in ignoring the vocational expert's testimony that, if the

restrictions assessed by Dr. Womack and Dr. Smith were applied, there would be no jobs available, *i.e.*, that she would be rendered disabled. The Court agrees that, when the vocational expert was posed questions that incorporated the restrictions assessed by Dr. Womack and Dr. Smith – in addition to Swallows's own description of her limitations – the vocational expert testified that Swallows would be unable to work. (R. 70-72.) Additionally, the ALJ gave administrative notice that, if the opinions of Hawkins were given full weight, Swallows would be unable to work. (*Id*. at 72.) However, the Court has already found that the ALJ's decision to give little weight to the opinions of Dr. Womack, Dr. Smith, and Hawkins was supported by substantial evidence; the Court has also found that the ALJ's decision not to fully credit Swallows's statements concerning the intensity, persistence, and limiting effects of her symptoms to the extent that they were inconsistent with the RFC was supported by substantial evidence. Thus, the ALJ's decision not to accept the vocational expert's testimony that Swallows would be unable to work had the opinions of Dr. Womack, Dr. Smith, and/or Hawkins been given full weight is likewise supported by substantial evidence.

### 5. Finding 11

In Finding 11, the ALJ determined that Swallows had not been under a disability from March 31, 2010 through the date of his decision, May 10, 2013. The Court is unsure what Swallows's specific contention is with respect to this finding, other than she contends that she is disabled. Swallows does not appear to contest the dates described in Finding 11, and the Court has addressed all of Swallows's substantive arguments in the other sections of this memorandum opinion. Because Swallows has not provided any meaningful argument with respect to Finding

11, the Court declines to consider a remand on the basis of Finding 11. *See Layne*, 192 F.3d at 567.

As a final matter, Swallows argues that this case should be remanded because the Appeals Council failed to consider evidence that was provided to it, specifically the Representative Brief filed after the ALJ's decision was rendered on May 10, 2013. (*See* R. 1-5, 198-203.) Swallows claims that the Appeals Council acknowledged receipt of the Representative Brief, but made no comment regarding same in its denial of her request to reverse the ALJ's decision. (*Id*.) Swallows provides no authority for her contention that the Appeals Council's alleged failure to consider the Representative Brief is cause for a remand. Nor is she able to. "An Appeals Council order denying review is not, however, a reviewable order; such an order serves only to make the decision of the ALJ the final reviewable decision of the Secretary." *Meeks v. Sec'y of Health & Human Servs.*, 996 F.2d 1215 (6th Cir. 1993) (citing 20 C.F.R. § 404.955). Moreover, the Sixth Circuit "has repeatedly held that evidence submitted to the Appeals Council after the ALJ's decision [like the Representative Brief submitted here] cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Therefore, this argument is a non-starter.

## III.    CONCLUSION

For the foregoing reasons, it is **ORDERED** as follows:

(1) The final decision of the Commissioner is **AFFIRMED** and this action is **DISMISSED WITH PREJUDICE**.

(2) A final judgment will be entered separately.

cc:  Counsel of record